So Mr. Sandek, you have reserved two minutes for rebuttal. That gives you eight minutes out of the gate. The floor is yours. Thank you very much. Good morning and may it please the court. My name is Harry Sandek. I'm from Patterson Belknap and I'm here with Bonnie Robinson, my colleague. We represent Abraxas De Scala. And this morning, we'd like to address two of the issues raised in our brief. Errors that deprive my client of a fair trial and of his constitutional rights. We want to address first the district court's denial of the motion to suppress the wiretap without a hearing. Despite the fact that the wiretap had a host of errors, wiretap affidavit had a host of errors, some of which the government has conceded over time or has not really contested. And despite the fact that the wiretap affidavit was based in significant part on the undisclosed use of information learned from our client's lawyer. The other issue we want to talk about is the improper repeated introduction of lay opinion testimony. An error this court has pointed out time and time again, and which occurred in this trial in spectacular fashion. First on the wiretap issue, the district court erred here. There were numerous errors in the wiretap application, including factual errors. The district court at one point said there was a fog of numbers. But rather than resolve and dissipate the fog of numbers through process, through a hearing, the district court in a paragraph of analysis on page SBA 30 basically just said, well, there's a lot of other stuff in the affidavit. I don't really need it. There wasn't a lot of stuff in the affidavit, wasn't there? I mean, it's over 100 pages of material, right? Well, the affidavit was definitely long. But if you do what this court has said and what the Supreme Court has said in Franks should be done, which is you essentially strip away the aspects of the affidavit that are incorrect or contain material omissions, you're left actually with very little here. You're left with a discussion of price fluctuations. You're left with communications between Matthew Bell, the co-conspirator, and CodeSmart investors, but not involving De Scala. Some uncorroborated assertions from a couple of other cooperators who did not know De Scala. And then text messages from De Scala, which we submit are not, in fact, inculpatory on their face. He says in one of them, we're doing it right. He says in another, no one controls the price of cube. If you strip away the crucial errors here, which are, number one, did De Scala make or lose money during the relevant time period of the wiretap records that were actually looked at by the agent? He lost money. The agent said he made money. And then the agent said that by making money, he fits into the paradigm case of a market manipulator. Did De Scala trade at the time the market peaked? The agent said he did. But, in fact, the records show that he didn't. He was buying at the peak and selling afterwards, the opposite of the hallmark. Did De Scala make or lose money on other investments? Three companies that are shorthanded in the papers as Sol, Location, and Vibe. The agent said in, this is Appendix 133, Note 7, that he, in fact, De Scala made money. But then when the government provided the blue sheet records that were the basis for the affidavit, there was literally nothing in there about Sol, Location, or Vibe. The agent said the use of triangular merger is an indicator of fraud. But, in fact, the SEC bulletin that was relied upon doesn't actually say that. He mischaracterizes aspects of CodeMart's SEC filing. So you strip all of these things away, and you're not left with probable cause. At a minimum, there should have been a hearing here to dissipate the fog of numbers and to figure out whether what was actually left behind, essentially to do what Frank says, which is you create a hypothetical version of the wiretap affidavit that doesn't include the errors, that corrects the errors. And so if that was done, there would have either been a hearing here, or the court would have concluded no probable cause. So help me understand. Like, I'm thinking about, just to pull out, because it gets pretty weedy pretty fast on this one, but to pull out the bit about buying and selling at the top, right? Yes. If the statement was, and I'm sorry, I don't have it. Well, I think I do have it, actually. De Scala, as well as certain individuals associated with him and his companies, blah, blah, blah, sold when he was high. And it turns out that collectively the group did sell high, but his particular block, because of the way the buying and selling was happening, wasn't the one that was sold at the top. Is that enough of an explanation that you don't need a Franks hearing and that you wouldn't knock that out because the evidence overall of the collective selling at the top and making a lot of money is what really matters? Well, we don't think that would solve it for a number of reasons. Number one, they were going up on De Scala's phone, not other people in the conspiracy. Number two, the way the affidavit's written, it's on page A116 in paragraph 20. It says, Trading records show that De Scala, as well as certain individuals associated with him, dot, dot, dot, got them low and sold when they peaked. So the actual claim isn't just that the conspirators as a whole, but that De Scala in particular did this. And it just turns out not to be true. So the district court says, well, given the data set that they were working with, I can totally see what happened here. Because if you search based on De Scala's account numbers, you get a certain understanding. But if you search based on his name, you get a different one. But then that excludes people who were trading under him, et cetera, et cetera. And so given that there are different ways to slice and dice the data, at least I understood the district court to say you can't get to raising the specter of deliberate false statements or reckless disregard for the truth on this one. What's wrong with that conclusion? Sure. What's wrong with that conclusion is two things. Number one, the court never actually makes the factual finding. He says, this is on page SPA21, ultimately there appears to be a reasonable explanation. Then he offers two potential theories for why it's reasonable. The government put literally no factual analysis into the record. They did not do what they might have done, which is have Agent Perconi come back and say, yes, this is what I did. If they had done that, then he could have been cross-examined, and you'd have a fair test as to what actually Agent Perconi did. But this is really speculation or guesswork by the district court. And it's on a crucial issue. Whether or not during the relevant time period that was analyzed, De Scala made money. So what should have happened here is the district court should have either required additional submissions or held a hearing to decide what did the agent actually do instead of deciding it through guesswork or speculation. Was a hearing requested? A hearing was requested. And it was on the government's objective? Yes, the government did not agree that there should be a hearing on this issue. They felt that it wasn't required. I only have about a minute or so left. I want to turn briefly to the lay opinion testimony, because I just think it's such a serious error, given this court's history of pointing out over and over again that you cannot have lay opinion testimony that is, in fact, either expert testimony or just summarizing the evidence. Are you talking about Agent Vogaris? Yes, in particular, Agent Vogaris, whose testimony violated all of the lay opinion requirements. And the government, to some extent, acknowledges that this was error. Agent Vogaris did not testify based on his perceptions. He talked about how five other agents worked on it, worked on the case with him. At one point, the government said that his testimony saved a week of witness testimony. So the government concedes there was error in allowing Agent Vogaris to testify to evidence that his team collected. But wasn't that cured by the district court's charge? Cured of charge? Not on these circumstances for two reasons. One reason is the prejudice from it, which I can explain in a moment. But the first and foremost reason is that the district court's charge says, and I'm quoting, I think it's at A1264, that Agent Vogaris believes on the basis of his experience and training that there was evidence of market manipulation. The problem with the charge is if it's based on his experience and training, then it should be expert testimony. So the judge, I would submit, actually compounded the nature of the error here by, instead of maybe calling it summary evidence or something else, he actually tells the jury to invest this in the same way that he would think about expert testimony. And the problem here, in particular, is that the government presented Vogaris and his direct as someone with substantial Wall Street experience. I was exposed on cross to be totally- But the cure of charge said that Agent Vogaris is not testifying as to his conclusions about things that are for you ultimately to decide. For example, whether there's been manipulation of any of the stocks. Doesn't that cure the problem of Agent Vogaris's testimony? So I don't think it cures the problem because of the repeated nature of the violation, that it can't be so easily cured through an explanation that language Your Honor quoted. That was a positive part of the instruction. But the other part of it, telling them to treat him like an expert, is exactly the opposite of what he should have done. But there was no objection to the instruction, right? Well, there were objections throughout all of this. To the instruction, to the instruction that the jury got about Vogaris's testimony. Well, the objection was not to the specific wording of the instruction. It was a motion for a mistrial to stop the entire thing. So you think a motion for a mistrial preserves an objection to a charge, to instructions? No, Your Honor. But the argument we're presenting on appeal is not essentially that if they had fixed the instruction, this would be okay. Well, no, but Judge Pooler asked, didn't this instruction cure it? And your view is no. But it seems like you're also saying that it was a flawed instruction. And that was not objected to, right? So that aspect of it, Your Honor, would then be reviewed by a higher standard, not by a harmless error standard. We submitted his plain error here to say to a jury, after explaining to the lawyers, well, I can let this in because it's lay opinion testimony. And then giving an instruction that he's testifying based on his expertise in the area, that would pass a plain error test. I mean, at least in my looking at the summations, I didn't see the government really rely on Vogaris's testimony in its summation. Am I wrong about that? Well, the government, the government in, I don't think, I think what the government dwelled on in the summation was the wiretap playing. Well, that's your other point. Yes, exactly. So I don't want to say that in summation that the government relied very heavily on this. They didn't rely on the affidavit to the wiretap. They relied on the evidence that came out of the wiretap. That's correct. They relied on all of the different phone calls and evidence that were allowed in because the wiretap motion was suppressed. But the government did make very significant use of Vogaris's testimony. First, they said it saved them a week of other testimony. They described it, this is at page 1310 of the appendix. On page 1312, the government said his testimony was essential orientation for the jury. He was the only witness to talk about the involvement of two people, Caridi and Arlo, who the government said were co-conspirators. He was the only witness to decode GP in the wiretaps and text. It was a reference to Guardian Princess. It was Kylene Kane, the co-defendant. He was the only witness who claimed that the press releases were coordinated with the timing of the trades. Other evidence, including some summary evidence from the government, did not bear that out. And only Vogaris said that the defendants could dictate the trading price of Q, the second of the code sparring Q. Only Vogaris said that. The other witnesses were much more equivocal. So this is very similar to what the government has done in a host of other cases, including in Garcia. And in the Winnick case, they fight very hard to get the evidence in and then come to the 17th floor and say it was all harmless error. And this was not harmless error. It did prejudice the defendant, and it was a significant point in the trial. All right. Well, you've reserved two minutes for rebuttal. We'll now hear from Ms. Jones on behalf of the government. Good morning. May it please the court. Shannon Jones for the United States. I'm here along with David James. I was also one of the attorneys who represented the government at the trial and in the proceedings below. Okay. And you seem to be conceding now that some of the testimony of Vogaris was improperly introduced, right? Your Honor, we concede that where he testified about evidence we obtained referring to the investigators and the other agents overall, that it should not have been that. It should have been based on his own personal investigation. However, I would like to point out that the testimony that De Scala is complaining about was the preliminary discussions about the investigative steps that the agents took. Why did you obtain a search warrant, and what were the next steps that you took? Not necessarily about A.J. De Scala specifically. So he should not have tested about steps, investigative steps that other agents testified about, but he did not testify about credibility issues, about other co-defendants. He did not summarize any cooperator testimony. He did not summarize information that was outside the scope of what was in front of the jury. He was explaining these are the investigative steps that we took and why. All right. But the end why becomes important, right? Because the end why is typically we got a warrant why. Because we concluded that there was evidence of market manipulation. Right? And he gives some reasons. Right. Is that proper lay testimony to describe what's essentially a legal conclusion about what these facts mean for the legal culpability? The defendants objected to that testimony, and we discussed it in front of Judge Vitaliano, and he gave that limiting instruction. Again, it would not have been proper for the agent to testify about the knowledge and intent of the defendant, which he did not. Again, he was just sitting forth. The investigation revealed evidence, which to the extent that that information came from other individuals, and he was summarizing it, we conceded that that was not okay. But even if the evidence was not from other individuals, he's describing a conclusion about what this evidence collectively reveals for whether there's a violation of the law. And I'm trying to understand whether your position is that that's proper lay testimony. I think that in this particular instance, we conceded where we thought that he made an error. And is that one of the things you've conceded? I'm just trying to understand how far the government's concession goes here. It goes to the testimony. We obtained evidence showing illegal manipulation. We conceded that. To the extent that there's other testimony, and that was very short, up front, in beginning, before, and before, and there was a curative instruction, which the defendants did not object to. Okay, they didn't object to it, and they're not raising that as an independent challenge on appeal. But if the argument with respect to the challenge to this testimony, which was objected to, is that any error was cured by that instruction, what do we do with the fact that the instruction said, well, Agent Volgaris made these conclusions based on his expert qualifications, not having qualified him as an expert, but you have to make the decision yourself. Didn't the court inadvertently bolster rather than diminish the impact of that testimony through the supposedly curative instruction? I think the curative instruction was, this information is just based on what the agents did during their investigation. He was not opining on the ultimate conclusion that the jury was supposed to reach. He wasn't even opining about the defendants. He was opining about, this is what the investigators learned during the course of the investigation, and as a result of that, we took these additional steps. Not to establish the elements that we were trying to prove at trial, but to explain to the jury, these are the steps that we took to counter any arguments by the defendants, that there was overreaching or impermissible actions by the agents in terms of getting a search warrant or searching the defendant's house or taking these additional steps that we did to gather the evidence that was being presented before them. That may be your motivation, but I'm still trying to understand whether it's proper. I think what I'm hearing is, to the extent that he relied on anything other than his first-hand obligations in describing those conclusions, the government concedes that that's not proper, not going to do it in the next case, but argues that in this case, it's harmless. Also, the government did not try to qualify Agent Valgaris as an expert based on any prior work history in the securities industry. We asked a few preliminary questions about his background, and then it was defense counsel on cross-examination that did this really long examination about, well, where did you work, and what did you do, and all that stuff. Now, turning to the other statements by Agent Valgaris, talking about what saved a week of testimony, it was things like, okay, there's a call between Jamie and Victor. Is there a Jamie in this case? Yes, there's a Jamie Sloan. Is there a Victor in this case? Yes, that's Victor Azraq. He did not opine, that conversation is about this. He said, during the course of my investigation, I learned that there was a Jamie Sloan involved, who the jury had already heard from. There was a Victor involved, who's Victor Azraq, who the jury had already heard from, and things like BD, I heard that over the wiretap. That was a reference often to broker-dealer. Agent Valgaris testified. He sat in the wire room. He listened to intercepted calls. His information about that, he was presenting about very undisputed and uncontroversial facts, like 451. That is likely a reference to $4.51. He didn't say it's about this particular stuff, or try to interpret the calls, other than giving helpful guideposts, so we all know what is being discussed on this call, based on his own personal knowledge of the investigation. Regarding the reference to GP, there was absolutely no dispute that GP was Kyleen Kane. There was a stipulation on the record about who are the participants on these various calls. There are calls between Descala and Kyleen Kane. Kane Descala refers to her as guardian princess. I mean, I'm sorry, Kane Descala refers to her as GP. I mean, but it sounds like now, mostly what you're saying is that there were statements that he made that were not improper. But you're conceding that there were some that were improper, right? Just that we obtained evidence, you know, market manipulation. I'm not conceding that when he testified that he- Well, I mean, he also concluded the guilt of the defendant in a couple of spots, didn't he? No, I don't believe that he did. He didn't conclude market manipulation? He didn't say we concluded that there was market manipulation? He was talking about the overall investigation, which was- There were, you know, nine people indicted, most of- several who had pled guilty and were testifying- had already testified in front of the jury. So the investigators believed that they had evidence that there was market manipulation that was occurring. Going back to the wiretap, as the court has pointed out, there was a wealth of probable cause to support that wiretap. And the government's arguments before the district court was that the- De Scala had not made a substantial preliminary showing necessary to entitle him to a Franks hearing. Most of the arguments related to the trading related to one statement in that wiretap affidavit, which was trading records show that De Scala and individuals associated with him received free trading CoSmart shares when the price was low and sold a large amount of shares at the time that the price peaked. That was it. There was no discussion about profit, how much money anyone made, and there were discussions about the other co-conspirators and trading that they had done. The wiretap affidavit also set forth information about a false press release that had been issued by CoSmart, the unrealistic revenue projections, and the SEC filings, and there was discussion about the two victims of Matthew Bell, a broker in Texas. And while De Scala claims that there was no connection between De Scala and those victims, that's not true. As set forth in the wiretap affidavit, these individuals, elderly couples who had invested with Bell, lost money with CoSmart. They contacted Matt Bell to complain about their losses in CoSmart. There's a flurry of telephone conversations, text messages, which we don't have the substance of, but we can see the contact over the telephone that he's talking to De Scala. And then De Scala later provides the shares that were used to compensate the victims at a reduced below market price. So to say that there was no connection between De Scala and these victims in Texas is simply not true. And so there was a wealth of reasons for the district court to find that the wiretap affidavit set forth a motherload of evidence supporting the finding of probable cause and no reason to believe that Special Agent Bracconi made a recklessly risk-making material misrepresentations or omissions to a Title III court. And the arguments that De Scala was making before the judge that created this fog of numbers was something that De Scala created by constantly- Can I ask one question about the charge? Sure. That neither attorney mentioned as yet. The judge gave a charge on conscious avoidance. Conscious avoidance, okay. Did the government ask for that charge? We did. And what was the basis in the testimony before the jury that led you to believe that that charge was necessary? Okay, so that charge was a general charge relating to knowledge and intent that applied to both A.J. De Scala and Kyleen Kane. And A.J. De Scala and Kyleen Kane had both made arguments in their opening statements before the jury that they did not understand what was going on, they did not have the knowledge, they did not know that manipulation was going on. In particular, Kyleen Kane made a number of arguments very successfully, as she was ultimately acquitted, that all she did was sell cube stock. She didn't engage in matched trading. She wasn't involved in coordinated trading. And so, therefore, any argument that we had made based on the evidence from her jury that she was fully aware that the stock that she was selling was being purchased by her co-conspirators at prices that they were selecting, that there was a basis for her to understand that she was participating in a conspiracy. A.J. De Scala also made similar arguments about not knowing that there was this matched and washed trading going on that fully supported that argument. And, again, this charge applied to both defendants. Both defendants were arguing about their knowledge and intent. Both were claiming they were unaware of certain facts. And is that enough to say, I didn't know this was happening? Is that enough to get a conscious avoidance charge? Or do you need something like, you know, evidence that they left the room when somebody started to talk about it or hung up the phone or, you know, do you need something more? Or is it just enough to say, I didn't know this was going on? I mean, in this case, there was evidence that if they didn't know, it was because they purposely closed their eyes. For example, there was a conversation between A.J. De Scala and Darren Goodrich, a broker, and he's talking about, I'm going to have people get together, you know, make these purchases. And Darren Goodrich is like, I don't want to know about what other people are doing. Don't tell me about what other people are doing. And A.J. De Scala, instead of saying, well, what are you talking about? Why is that improper? You know, what are you going on? He's like, okay, gotcha, gotcha, gotcha, gotcha. So that would support a charge in a case against Goodrich. And, well, De Scala's not asking any questions. And when he attempts to rely on, I had, during his own testimony, he's like, I had these experts who were advising me, like Kylene King. You know, she was, you know, I assumed if she was doing it, it was okay. But then we also have conversations where he's on the water top telling people, she doesn't like talking about that. So, you know, you should talk to her about it directly. And there are many instances where they're like, we don't want to talk about this. And there's no follow-up questions about, well, why? Why is that improper? I don't understand. It's like, okay, okay, we're not going to talk about it on the phone or we're not going to talk about it at all because it would be improper. Thank you. All right. Thank you very much. We'll now hear from Mr. Sandick for two minutes of rebuttal. Thank you, Your Honor. With respect to the conscious avoidance issue that was just raised, from the beginning of this case to the end, to the sentencing, De Scala was described as the ringleader. And so it defies logic that the ringleader also consciously avoided knowing the key details. Well, it's pretty clear that, I mean, the government can have an alternative theory, right? I mean, they can rely principally on actual knowledge but then also assert conscious avoidance as long as there's some predicate for it in the record. As long as there's some predicate for it in the record, Your Honor. And here the argument that is made primarily in the briefing is that De Scala contested knowledge and therefore conscious avoidance was an appropriate charge. So you're arguing that he knew too much? Well, the government tried this case as De Scala knew too much. And then getting nervous about the fact that he did deny knowledge and perhaps concerned about the fact that some jurors might not, you know, might go along with his denial of knowledge, they, as belt and suspenders, got a conscious avoidance charge. But you just cannot get that unless there is evidence, you know, the drug dealer took a suitcase from Amsterdam to New York and was paid $20,000 and told not to look in the suitcase and he didn't. That's a conscious avoidance argument. Wait a minute. So there was testimony that he was learning not to openly discuss what other people were doing. Not to openly discuss is disguising the evidence. It's not the same as consciously avoiding learning the objectives of the conspiracy. Well, that sounds like argument. But, I mean, it would seem to me that that testimony could be construed as somebody who's putting their head in the sand. I mean, it could be argued that it's not that, but that's an argument for the jury. Yeah. It would be an argument for the jury, Your Honor, if there were more evidence of him actually taking steps to avoid learning key aspects of the conspiracy. With respect, very briefly, with respect to the lay opinion testimony, on page 1261, you have the agent talking about market manipulation, that, you know, how did the search warrants further the investigation? We obtained additional evidence supporting market manipulation. And at 1271, he's asked, who controlled the account? And the agent says, Kylene Kane. This is exactly what the court talked about in the Greenwich case, and said it's a fundamental misunderstanding of 701B to think that you can just have an agent summarize all of this. If it's accepted, the court says, there would be no need for the trial jury to review personally any evidence. The jurors could be helped by a summary witness who could not only tell them what was in the evidence, but what inferences to draw from it. That's what the agent did here. All right. Thank you both. We will reserve decision. Thank you.